## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| **KAREN MCCLOSKEY,** | ) |
| 42657 Cochrans Lock Drive | ) |
| Ashburn, VA 20148 | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) Civil Action No. _____ |
| v. | ) |
|  | ) **JURY TRIAL DEMANDED** |
| **DISTRICT OF COLUMBIA** | ) |
|  | ) |
| Defendant. | ) |
|  | ) |
| **SERVE:** | ) |
|  | ) |
| **QUINCY L. BOOTH, DIRECTOR** | ) |
| **DISTRICT OF COLUMBIA DEPARTMENT** | ) |
| **OF CORRECTIONS** | ) |
| 2000 14th Street, NW, Seventh Floor | ) |
| Washington, DC 20009 | ) |
|  | ) |
| **MURIEL BOWSER** | ) |
| **MAYOR** | ) |
| **DISTRICT OF COLUMBIA** | ) |
| 1350 Pennsylvania Avenue, NW | ) |
| Washington, DC 20004 | ) |
|  | ) |
| **KARL A. RACINE** | ) |
| **ATTORNEY GENERAL** | ) |
| **DISTRICT OF COLUMBIA** | ) |
| **OFFICE OF THE ATTORNEY GENERAL** | ) |
| 400 6th Street, NW | ) |
| Washington, DC 20001 | ) |

_____

## <u>COMPLAINT</u>

1.      Plaintiff Karen McCloskey brings this action for damages based on the denial of her rights

under the Federal Family Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"); the District of

Columbia Family Medical Leave Act, DC Code 32-501 *et seq.* ("DCFMLA"); Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended by the Civil Rights Act of 1991 (hereinafter "Title VII"); and the District of Columbia Human Rights Act of 1977, D.C. Code § 2-1401 *et seq.*, as amended (hereafter "DCHRA").

2. Defendant, the District of Columbia, unlawfully retaliated against Ms. McCloskey for invoking her right to use FMLA and DCFMLA, and interfered with her rights under FMLA and DCFMLA, by failing to return her to a position with the same job duties and responsibilities that she had prior to her FMLA/DCFMLA leave usage, as well as discouraged her FMLA leave usage.

3. Defendant, the District of Columbia further unlawfully retaliated against Ms. McCloskey in violation of her rights under Title VII and DCHRA by materially reducing her job duties and responsibilities, which had a negative impact on the terms and conditions of her employment, thereby discouraging her protected activity.

## JURISDICTION AND VENUE

4. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 1343(a), the federal Family and Medical Leave Act, 29 U.S.C. § 2617; the District of Columbia Family and Medical Leave Act, D.C. Code 32-510; Title VII, 42 U.S.C. § 2000e-5; and the District of Columbia Human Rights Act, D.C. Code § 2-1403.16.

5. Pursuant to 28 U.S.C. § 1391 and 42 U.S.C. § 2000e-5(f)(3), venue is proper in the District of Columbia which is the location where Plaintiff worked while employed with the District of Columbia.

## THE PARTIES

6. At all times relevant to this Complaint, Ms. McCloskey worked for the District of Columbia government. Ms. McCloskey is employed by the District of Columbia Department of

Corrections ("DOC"). The Department of Corrections is an executive branch agency of the District of Columbia government.

## FACTS

7.      The averments set forth in the foregoing paragraphs are adopted and incorporated herein by reference.

8.      Ms. McCloskey began her employment with DOC on February 11, 2013.

9.      DOC hired Ms. McCloskey as an IT Specialist, Database Management.

10.     Ms. McCloskey was the only trained and experienced database professional in DOC's IT group. Ms. McCloskey has extensive professional training, knowledge and expertise working with production databases. Ms. McCloskey is a trained Master Level Oracle, SQL Server administrator with many years of experience. Ms. McCloskey has a Master's Degree in Information Systems and several high level certificates of professional IT training.

11.     During all times relevant to this Complaint, Mr. Baron Hsu, Supervisory IT Specialist, served as Ms. McCloskey's first-line supervisor.

12.     As a Database Management IT Specialist, Ms. McCloskey is responsible for providing "a comprehensive range of administrative services for relational database management systems (RDBMS)." Ms. McCloskey works with "application owners to determine the hardware requirements (e.g., amount and number of disk drives required, central processor characteristics) to meet the level of responsiveness and processing required to deliver database services to end users."

13.     Some of the major duties of Ms. McCloskey's position include: Database server software installation; Database Planning; Database Creation; Developing and implementing backup and recovery plans; Developing and monitoring plans for storage utilization; Developing and

implementing performance monitoring plans; Problem exception detection and reporting; Developing and implementing a system security policy; Developing and implementing a user security policy; and Developing and implementing access auditing policy.

14.     The specific tasks assigned to Ms. McCloskey during her tenure with DOC were administering and managing database monitoring, backup, restoration, testing, troubleshooting, connectivity, upgrading, and other administrative service of the JACCS, CENTRICITY, and CENSUS databases, as well as ORACLE/SQL servers for the DOC. Ms. McCloskey provides critical support for these DOC production/relational databases.

15.     On or about August 18, 2016, Ms. McCloskey filed a discrimination complaint with the District of Columbia Office of Human Rights ("DCOHR") by completing an Intake Questionnaire.

16.     On or about October 31, 2016, Ms. McCloskey filed a second internal EEO complaint.

17.     On or about February 24, 2017, DCOHR accepted Ms. McCloskey's complaint and issued a Charge of Discrimination asserting that DOC and its agent Mr. Hsu discriminated against Ms. McCloskey on the basis of sex, national origin and retaliation.

18.     On or about April 12, 2017, Ms. McCloskey filed an Amended Charge of Discrimination with DCOHR.

19.     On or about April 25, 2017, DOC placed Ms. McCloskey on administrative leave with pay pending an investigation of a proposal to remove.

20.     On or about May 22, 2017, Ms. McCloskey filed a second Amended Charge of Discrimination with DCOHR.

21.     On or about June 26, 2018, Hearing Officer Rudy Chounoune, Jr., Assistant General Counsel, Fire and Emergency Medical Services Department, issued a Report and Recommendation

finding that DOC failed to establish cause and that the proposed penalty of removal against Ms. McCloskey was unsupported by the evidence.

22.     On or about July 18, 2018, Mr. Hsu gave a sworn statement in connection with the investigation of Ms. McCloskey's Charge of Discrimination with DCOHR.

23.     Despite the finding of no probable cause in June 2018, Ms. McCloskey remained on administrative leave from April 25, 2017 to June 16, 2019, when her employment with DOC was reinstated.

24.     In 2019, Ms. McCloskey's husband became seriously ill. He was hospitalized several times, over many months, for a serious medical condition. His health continued to deteriorate, and he eventually died from his ailment.

25.     On June 24, 2019, Ms. McCloskey requested Family Leave beginning June 27, 2019 to care for her husband. DOC granted her request and Ms. McCloskey received FMLA leave through August 22, 2019.

26.     On August 14, 2019, Ms. McCloskey made another request for Family Leave beginning August 22, 2019 to care for her husband. DOC granted her request and Ms. McCloskey received FMLA leave through September 16, 2019.

27.     When Ms. McCloskey returned to work from FMLA on September 16, 2019, DOC and its agent, Mr. Hsu, retaliated against Ms. McCloskey in violation of Title VII, DCHRA, DCFMLA and FMLA by failing to give her the same job duties and responsibilities she had previously as a Database Management IT Specialist, as well as taking other material and adverse actions against her that impacted the terms, conditions of her employment and discouraged her from engaging in protected activity.

28.     Previously, before her FMLA leave and her DCOHR Charge of Discrimination, Ms. McCloskey was primarily responsible for DOC's JACCS, CENTRICITY, and CENSUS databases.

29.     Upon her return in September 2019, Mr. Hsu failed to provide Ms. McCloskey with any guidance, work instructions, or an overview of her job responsibilities.

30.     Seeking to clarify her role in the office after her absence, Ms. McCloskey made numerous inquiries to Mr. Hsu about her job duties and responsibilities without any response.

31.     On September 23, 2019, Ms. Tashenna Harris, a co-worker who Mr. Hsu would eventually assign to manage Ms. McCloskey's work on the KACE Help Desk project, reported to Mr. Hsu that Ms. McCloskey had her personal laptop in the office.

32.     Ms. McCloskey had her own computer because Mr. Hsu failed to provide her with the tools, materials and equipment necessary to do her job. Ms. McCloskey was the only IT employee without a laptop computer.

33.     On September 24, 2019, Ms. McCloskey received a written counseling letter from Mr. Hsu admonishing her for bringing her laptop to work without official approval. According to Mr. Hsu, such conduct would not be "tolerated" and "further demonstrations of non-compliance will not be tolerated and may lead to future disciplinary action."

34.     Michel Ramirez, a co-worker, brought his son's laptop into the office. Mr. Ramirez suffered no consequence and Mr. Hsu took no disciplinary action against Mr. Ramirez.

35.     Upon information and belief, the ban against the use of personal electronic devises in the office was a new policy, and until Mr. Hsu wrote in the letter that "from the date of September 24, 2019 employee shall not be allowed to bring in any personal electronic device to work," Ms. McCloskey was unaware that she could not use her laptop. After receiving the counseling, Ms.

McCloskey looked for, but was unable to find a DOC published policy covering this requirement. Thus, this was a new rule used only to punish Ms. McCloskey for her EEO activity and for taking FMLA leave.

36.      Ms. McCloskey and her Union representative met with Mr. Hsu about the letter of counseling. During the meeting, Mr. Hsu was very disrespectful and unprofessional toward Ms. McCloskey. The next day after the meeting, Mr. Hsu was accused of the same violation when he was stopped by DOC security for bringing his computer to the office without prior approval.

37.      Finally, in an email dated September 23, 2019, Mr. Hsu informed Ms. McCloskey that she had two tasks which were: a) the KACE Help Desk project and; b) documenting backup of the JACCS database to a test server.

38.      Mr. Hsu's September 23, 2019, email did not provide Ms. McCloskey with any details about the tasks assigned. Furthermore, Ms. McCloskey was expected to be managed by co-workers who were of the same rank and not supervisors, namely Ms. Tashenna Harris, Rajiv Rehani, Xusheng Wang and Shu Peng.

39.      Seeking guidance, Ms. McCloskey sent an email to Mr. Hsu on October 7, 2019, asking why she was excluded from a group meeting with the other IT database specialists. Ms. McCloskey asked specifically, has "my job description been changed? What is my role in the team now?" Ms. McCloskey also noted that she was in a temporary office and that her new desk location had not been finalized.

40.      Mr. Hsu avoided answering Ms. McCloskey directly in his first response dated October 7, 2019, and simply responded that staff meetings were scheduled according to work assignments and that the KACE Help Desk team would be meeting later that week.

41.     Mr. Hsu's response was unsatisfactory and did not address the fact that Ms. McCloskey's role and responsibilities at work had significantly changed upon her return to work. Again, seeking an explanation, Ms. McCloskey send an email on October 7, 2019 which listed serval of the ways her job had changed and the unfair treatment she had received from Mr. Hsu since returning to work in September 2019: "I have job description which I has been hired. I could access all database server by job description. Now I could not access any of database – JACCS from production to testing server; CENTRICITY from production; CENSUS database; and all SQL server database from production to testing server. I do not have permission to any server. (JACCS production has been completely removed from RAC to single server, I did not have any notification from any database knowledge transfer). I has not assigned laptop (I am only person in the group without laptop so far). I should have same responsibility and permission as before if my role has not been changed. The meeting I heard all your group discussed about JACCS and CENTRICITY database and other things. It should be [part] of my work for my understanding."

42.     During a verbal discussion with Mr. Hsu about her duties on October 7, 2019, Mr. Hsu made it plain and did not deny the removal of the database responsibilities that were previously assigned to Ms. McCloskey. Mr. Hsu told Ms. McCloskey that: "Karen, very simple, your role has changed."

43.     In an email dated October 8, 2019, Mr. Hsu confirmed in writing that "DOC IT will keep the current staff on assigned projects" and therefore Ms. McCloskey's job was no longer the same, because "DOC IT has a full time database administrator responsible for JACCS, CENTRICITY and CENSUS databases." This left no doubt that Ms. McCloskey's prior job duties were now the responsibility of another employee.

- 8 -

41.     Mr. Hsu's response was unsatisfactory and did not address the fact that Ms. McCloskey's role and responsibilities at work had significantly changed upon her return to work. Again, seeking an explanation, Ms. McCloskey send an email on October 7, 2019 which listed serval of the ways her job had changed and the unfair treatment she had received from Mr. Hsu since returning to work in September 2019: "I have job description which I has been hired. I could access all database server by job description. Now I could not access any of database – JACCS from production to testing server; CENTRICITY from production; CENSUS database; and all SQL server database from production to testing server. I do not have permission to any server. (JACCS production has been completely removed from RAC to single server, I did not have any notification from any database knowledge transfer). I has not assigned laptop (I am only person in the group without laptop so far). I should have same responsibility and permission as before if my role has not been changed. The meeting I heard all your group discussed about JACCS and CENTRICITY database and other things. It should be [part] of my work for my understanding."

42.     During a verbal discussion with Mr. Hsu about her duties on October 7, 2019, Mr. Hsu made it plain and did not deny the removal of the database responsibilities that were previously assigned to Ms. McCloskey. Mr. Hsu told Ms. McCloskey that: "Karen, very simple, your role has changed."

43.     In an email dated October 8, 2019, Mr. Hsu confirmed in writing that "DOC IT will keep the current staff on assigned projects" and therefore Ms. McCloskey's job was no longer the same, because "DOC IT has a full time database administrator responsible for JACCS, CENTRICITY and CENSUS databases." This left no doubt that Ms. McCloskey's prior job duties were now the responsibility of another employee.

44.     Ms. McCloskey sent an email on October 8, 2019, to confirm that that her role changed. She also confirmed that she was not included in JACCS and CENTRICITY database meetings because Mr. Hsu placed her Mr. Harris' Help Desk group instead. Mr. Hsu cryptically responded by advising Ms. McCloskey to "follow all instructions/tasks assignments."

         **i.      KACE Help Desk Project.**

45.     Unlike the Database group, the Help Desk is entry level IT work and there are no responsibilities or tasks concerning production/relational database management systems. Ms. McCloskey has a Master's Degree on Information Systems which far exceeds the expertise required for the Help Desk group.

46.     Assigning Ms. McCloskey to the Help Desk was essentially a demotion and a significant decrease in job duties and responsibilities.

47.     The task assigned to Ms. McCloskey was to assist Ms. Harris to "update/maintain KACE hardware inventory database." Although, Mr. Hsu mentioned a "database" this was misleading as the hardware inventory task was nothing more than tracking the computers assigned to DOC employees or end users.

48.     Specifically, the KACE Service Desk is generally known as a help desk ticket management solution. KACE is not a database – it is an application that helps IT teams to track, manage and solve challenges reported by end users of IT. The KASE application also provides integrated tools that provide inventory tracking of IT assets on a network. Clearly, tracking hardware and computers for end users is a help desk related task.

49.     Further, Ms. Harris is a co-worker on the same level as Ms. McCloskey but assigned to the Help Desk group. As such, Mr. Hsu assignment of Ms. Harris to supervise or manage Ms. McCloskey was a devaluation of Ms. McCloskey's role as a database administrator.

50. Having no guidance about the KASE Help desk project other than Mr. Hsu's vague September 23, 2019, email, Ms. McCloskey contacted Ms. Harris on September 23, 2019, for details.

51. On September 26, 2019, Ms. Harris responded by sending an email with links to tutorials for using the KACE application, including a suggestion to review You Tube videos. According to Ms. Harris, she merely wanted Ms. McCloskey to become familiar with how to utilize the application, and that they would not be doing inventory migration at that time.

52. Given her familiarity with production/relational database management systems, Ms. McCloskey wanted to understand the database server aspects of KACE including whether ORACLE, SQL, ACCESS or another database was used. Ms. Harris, however, did not provide any database related information but instead simply instructed Ms. McCloskey in an email dated October 15, 2019, to be "prepared to discuss what you have discovered about the applications abilities."

53. Another employee, Nigel Robinson, who was also assigned this task, was likewise confused by the unclear direction and asked in an email on the same day, "what is your end goal with Karen and myself learning Dell Kace?" Ms. Harris responded essentially that she wanted the two employees to be "the leads over this part of the application knowing complete functionality."

54. Expecting Ms. McCloskey to become familiar with how to use a help desk inventory tracker application was far afield from the level of expertise she has in production/relational database management systems.

55. Ms. McCloskey attempted to explain her concerns related to this task by sending Ms. Harris an email on October 17, 2019, indicating that while she was willing to discuss the capabilities of the KACE application, she might not be the "right person" since she was a database person and

not knowledgeable about software applications. In particular, the KACE application was purchased from the vendor and could not be modified to improve functionality (which is what Ms. McCloskey normally did with database systems).

56.     During a subsequent meeting on October 21, 2019, in the DOC Warden's conference room, Ms. Harris explained that she eventually wanted Ms. McCloskey to input data into the software from an Excel spreadsheet. However, Ms. McCloskey expressed concern that the KASE was a client access application and entering data would be an entry level manual process. This was not the type of work performed by a database specialist, whose expertise involved going directly to the database IP and server to modify data and functionality of a software program.

57.     At this same meeting, a test login was created so that Ms. Harris and Ms. McCloskey could discuss the attributes and purpose of the software from an end-user perspective. Using the same test login after the meeting, Ms. McCloskey received an error message and was not able to access the KACE application, an issue which she reported to Ms. Harris. Thereafter, further work on the project stopped and Ms. McCloskey was given no further guidance or instructions about the task.

58.     The change in Ms. McCloskey's job duties and responsibilities from production/relational database management systems to the proposed project involving help desk related inventory management and tracking of end user IT equipment, as well as the change in reporting structure to a co-worker, was a material and significant change in the terms and conditions of Ms. McCloskey's employment with DOC.

      **ii.      Documenting Backup of the JACCS Database to a Test Server.**

59.     The second task assigned to Ms. McCloskey in Mr. Hsu's email dated September 23, 2019, was to map the process to restore a backup from the JACCS production server to a testing server with proper documentation.

60.     Although this task appeared to be more aligned with Ms. McCloskey's IT database expertise, it was only a test exercise, it did not involve actually performing a backup but merely providing documentation of the process required. In actuality, Mr. Hsu intended to set Ms. McCloskey up for failure by failing to give her the support and tools she needed to adequately complete the assignment, as well as by giving her conflicting, confusing and unclear instructions on how to complete the task.

61.     Although Mr. Hsu assigned the project to Ms. McCloskey in September, she did not receive sufficient information to proceed until November 14, 2019. Upon review of the task, however, Ms. McCloskey quickly discovered that she did not have all the information she needed.  In particular, Mr. Hsu failed to provide permission to download the ORACLE software necessary to complete the task and he did not give her an example to model what was expected to properly document the backup process.

62.     Once again, Mr. Hsu assigned a co-worker, Mr. Rajiv Rehani, to manage Ms. McCloskey's work on this project. By assigning Ms. McCloskey's supervision to her peers, many of whom had lesser experience or qualifications, Mr. Hsu reduced Ms. McCloskey's role, contribution, and value to the team.

63.     The devaluation of Ms. McCloskey's expertise further encouraged her co-workers to treat her in a disrespectful and demeaning manner, particularly when they were given unfettered permission by Mr. Hsu to comment negatively on her work performance. Mr. Hsu set-up this reporting scenario where Ms. McCloskey's co-workers were able to debase her professional esteem and reputation, all of which caused her unnecessary hardship.

64.     On November 18, 2019, Ms. McCloskey sent an email to Mr. Rehani to inform him regarding the status of the JACCS backup. The previous week, Ms. McCloskey requested

ORACLE software so that she could use it directly for the backup file restore assignment. She received no response and was not able to move forward on the project without this tool. Ms. McCloskey also called ORACLE support and tried to download the software, but she was informed that she did not have a support identified account. Ms. McCloskey also asked Mr. Rehani about her role in the Database IT group and whether she would receive the support she needed so that she could carry out her normal duties.

65.     On November 18, 2019, after making a second request, Ms. McCloskey received the correct version of the ORACLE software. However, she was restricted from downloading the software on her computer because she not was given authorization as an administrator. Upon information and belief, Ms. McCloskey was the only IT Specialist who was denied access to software as an administrator, and without this designation, Ms. McCloskey was severely restricted in her utilization of the software and her ability to do her job.

66.     Despite these obstacles, Ms. McCloskey submitted documentation showing that she completed the task on November 20, 2019.

67.     On November 25, 2019, the co-worker assigned to manage Ms. McCloskey on this task, Mr. Rehani, responded by claiming the work was incomplete. In Mr. Rehani's response, he included comments from four additional co-workers, which was a clear intent by Mr. Hsu to impugn Ms. McCloskey's professional reputation among her colleagues.

68.     Ms. McCloskey took note of the issues Mr. Rehani raised, discussed the changes and corrected her work, e-mailing documentation that the task was complete on November 27, 2019.

69.     On December 9, 2019, Mr. Rehani again claimed he reviewed Ms. McCloskey's work and this time, supposedly found a completely different set of issues of with her submission. This was

a completely new list of supposed issues than those supposedly identified previously by Mr. Rehani.

70.     Taking note of Mr. Rehani's comments, and responding to each item on his list, Ms. McCloskey resubmitted the task a third time on December 23, 2019.

71.     Mr. Rehani provided feedback to Ms. McCloskey on January 21, 2020 on the third submission by forwarding an email from Mr. Hsu, dated January 14, 2020 listing Mr. Hsu's concerns with the project. Ms. McCloskey replied on January 27, 2020 and she took issue with the fact that Mr. Hsu claimed there were errors which had not been identified as problems in her previous submissions.

72.     In an email to Mr. Hsu dated January 27, 2020, Ms. McCloskey noted her concerns and stated the following regarding the unfair treatment she received while working on the JACCS backup project: "The manner in which this document has been reviewed and commented on is extremely unprofessional and impossible to follow. It borders on harassment and bullying and appears to be your way of getting rid of me. You failed to give me the basic tools I need to do my job. For example, I was not given an ORACLE active account. I was not invited to or allowed to join any WebEx calls with the client. I was exclusively out from recent CENSUS database production upgrade. I was not assigned a laptop or cell phone or even VPN permission and I do not have any permission to access any of DOC database server. I've been given conflicting instructions: one minute I need to add screen shots, the next I need to split them. And I never see another backup/restore document looks like from our group."

73.     It is clear that the standards and requirements for the JACCS backup project were a moving target. No matter what Ms. McCloskey did, or her attempts to comply and follow the instructions/feedback she received, Mr. Hsu rejected her work each time. The project, which was

only a test exercise and not an actual backup, was a setup to provide a pretext to unfairly criticize give Ms. McCloskey's performance and to assert she carried out the project in an unsatisfactory manner.

74.     The change in Ms. McCloskey's job duties and responsibilities from production/relational database management systems to a test exercise to create documentation for the JACCS backup process, as well as the change in reporting structure to a co-worker, was a material and significant change in the terms and conditions of Ms. McCloskey's employment with DOC.

> **iii.     Mr. Hsu Interfered and Retaliated Against Ms. McCloskey Because of Her Exercise of FMLA, and Retaliated Against Her in Violation of Title VII and DCHRA, by Unfairly Imposing a "No Fault" Work Schedule and Treating Her Differently than Her Co-Workers.**

75.     Mr. Hsu imposed a "no fault" or restricted work schedule on Ms. McCloskey that was not extended to the entire department. This included no late arrival, no ability to makeup time and no flexible hours.

76.     Mr. Hsu singled out Ms. McCloskey with a "no fault" or strict work schedule whereas her co-workers were able to have flexible work start and end times. Mr. Hsu treated Ms. McCloskey differently and retaliated against her using leave in violation of Title VII and DCHRA.

77.     If Ms. McCloskey was just thirty (30) minutes late, Mr. Hsu would immediately demand that she submit a one-hour annual leave slip. This same requirement did not apply to her colleagues. Mr. Hsu also would not allow Ms. McCloskey to make up her time during her lunch or throughout the week as others were allowed to do.  Other employees were also allowed to come to the office late or leave early without any consequence.

78.     In one instance, on November 12, 2019, Ms. McCloskey informed Mr. Hsu that she reported an hour of leave the previous week, but did not use it, and wanted permission to use it

that week. Mr. Hsu responded that Ms. McCloskey was not allowed to switch her hours and that she was required to submit a proper leave slip for any leave she intended to take.

79.    Ms. McCloskey brought these differences in treatment to Mr. Hsu's attention. Realizing that he needed to create a pretext for his discriminating enforcement of policy, Mr. Hsu disingenuously sent an email to all IT staff notifying them about rules for being late. However, Mr. Hsu continued to allow flexibility in the schedule of Ms. McCloskey's colleagues while insisting that Ms. McCloskey adhere to a set, no fault schedule.

80.    Ms. McCloskey noticed, for example, that two co-workers, Tasheanna Harris and Andrews Ponti, appeared to have a flexible schedule. Also, when Nigel Robinson and Manish were late to the office, they were allowed to makeup the time by staying late.

81.    Furthermore, Mr. Hsu was keenly aware that Ms. McCloskey, during this time period, was dealing with the serious illness of her husband and had family care responsibilities which occasionally impacted her leave and attendance. Mr. Hsu ignored the relevant FMLA regulations, which should have excused her attendance issues, and instead sought to enforce a strict, no fault leave policy only upon Ms. McCloskey. Plainly, this retaliatory difference in treatment also interfered with and discouraged Ms. McCloskey from exercising her rights under FMLA.

> **iv.    Mr. Hsu Interfered and Retaliated Against Ms. McCloskey by Failing to Advise or Assist Her With Exercising Her FMLA Rights.**

82.    Ms. McCloskey continued to attend to the health care needs of her husband in October, November and December 2019, occasionally needing to take time from work for his care.

83.    Prior to her approval of intermittent FMLA leave, Mr. Hsu attempted to interfere and retaliate against Ms. McCloskey for requesting leave even though he should have assisted her in obtaining the appropriate leave she needed to care for her husband.

84.     For example, on October 28, 2019, Ms. McCloskey sent an email to Mr. Hsu advising him that she would not be reporting to work because her husband went to a hospital emergency room. Ms. McCloskey sent a similar email the next day indicating her continuing need for leave because of the serious medical condition of her husband.

85.     Mr. Hsu, rather than advising her of her FMLA rights, simply told Ms. McCloskey to submit a leave slip which, at the time, would require Ms. McCloskey to come into the office to provide documentation.

86.     Ms. McCloskey continued to need leave for the next several days and although she updated Mr. Hsu by email, informing him of her status, she was unable to provide a leave slip while away caring for her husband.

87.     On October 31, 2019, Mr. Hsu sent an email to Ms. McCloskey admonishing her for placing a leave slip on his desk showing 5 hours of time when she did not show up to work at all. He demanded that she submit a proper leave slip ASAP. Mr. Hsu also advised Ms. McCloskey of his strict employee attendance rules and regulations, which were not enforced against other employees, but again failed to dialogue constructively about assisting her with FMLA leave.

88.     Mr. Hsu's email was threatening and ignored her FMLA rights. Specifically, he told Ms. McCloskey that she needed to "submit a leave slip and notification email at least two hours ahead of daily working schedule" and that her previous emails did not meet this standard. Mr. Hsu also stated that Ms. McCloskey was required to "adhere to approved working schedule." Mr. Hsu further demanded "doctor notes/hospital documents to support [Ms. McCloskey's] requested leave" the past week.

89.     In fact, Mr. Hsu should not have imposed a "no fault" attendance policy or demanded sensitive and private medical information from Ms. McCloskey. Mr. Hsu should have spoken to

Ms. McCloskey to ascertain her need for leave if he had concerns about her attendance. Alternatively, Mr. Hsu also could have worked with an FMLA coordinator/HR specialist within DOC to obtain information and documentation for Ms. McCloskey's FMLA leave.

90.     On November 1, 2019, Ms. McCloskey responded by email stating that she had difficulty responding to his email request because she was in the hospital taking care of her husband. She asked Mr. Hsu, "Do you expect me to check email all the time in order to report my work schedule availabity?" She also noted that she only had her personal laptop as Mr. Hsu had not assigned a work laptop and did not provide a work cell phone. Ms. McCloskey asked him for advice on what procedure she should follow when she was in the hospital. Later that same day, Ms. McCloskey sent another email indicting, "I will try my best to update you. Sorry it is not in my control. Hopefully you understand. Everyone has family."

91.     On November 7, 2019, Ms. McCloskey invoked her FMLA rights and told Mr. Hsu, "I am in process FMLA, all time off during hospital care is covered by FMLA. I will update with you after it is finished."

92.     Mr. Hsu was obligated to coordinate with Ms. McCloskey about her need for leave but was instead threatening and demanding that she comply with a restive, no fault time and attendance policy.  Mr. Hsu failed to accommodate and work with Ms. McCloskey to assist her obtaining FMLA Leave, thereby interfering with her FMLA rights and retaliating against her.

93.     On November 12, 2019, Ms. McCloskey requested Family Leave beginning October 27, 2019 to care for her husband. DOC granted her request for intermittent leave on December 23, 2019.

94.     Accordingly, on January 10, 2020, Ms. McCloskey sent Mr. Hsu an email listing the days from October to December 2019 that she wanted counted as FMLA leave. Mr. Hsu responded that

he supposedly did not understand and did not know what to do with the request for intermittent leave, despite the numerous communications they exchanged from October to December 2019. Mr. Hsu should have been aware that Ms. McCloskey had the right to designate FMLA leave, and that he could communicate with Human Resources to make any necessary adjustments rather than communicate in an antagonistic manner with Ms. McCloskey to interfere and retaliate against her taking leave.

95.    Defendant's actions as alleged herein had a material and negative impact on the terms and conditions of Ms. McCloskey's employment. As a direct and proximate result of the unlawful acts of Defendant, and its agent, Mr. Hsu, Ms. McCloskey has suffered grievous harm to her professional career.  This harm includes, but is not limited to, loss of professional status and reputation, loss of career-enhancing and advancement opportunities, loss from unpaid leave status, loss of other leave and/or other financial losses arising from the claims herein.

96.    Ms. McCloskey suffered significant and undo stress as a result of the actions of Defendant and its agent, Mr. Hsu. Ms. McCloskey was in a constant state of fear, worry and anxiety about next negative and unfavorable action that Mr. Hsu would take against her. Ms. McCloskey was also fearful of being unfairly disciplined and/or being set-up for an action by Mr. Hsu that could result in the loss of her employment. Ms. McCloskey did not feel emotionally or physically safe working under Mr. Hsu's supervision and she perceived the work environment to be hostile. The stressful workplace caused Ms. McCloskey to break out in hives and suffer other health-related emotional distress.

97.    Ms. McCloskey avers that the incidents set forth in the foregoing paragraphs constitute illegal retaliation and interference under the DCFMLA and federal FMLA, as well as retaliation under Title VII and the DCHRA.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

98.    Ms. McCloskey has exhausted all administrative requirements that apply to the processing of her Complaint. On February 22, 2020, Ms. McCloskey submitted a report to the District of Columbia Metropolitan Police ("MPD"). The MPD issued an Exit Letter on April 17, 2020. Ms. McCloskey filed with the DCOHR on May 1, 2020. On October 1, 2020, DCOHR dismissed the case administratively without making any findings. Further, the filing with MPD and DCOHR provides sufficient notice to the Mayor pursuant to DC Code Section § 12-309.

## Count I:  Violation of the Federal Family and Medical Leave Act ("FMLA") Interference With the Exercise of Rights

99.    Ms. McCloskey re-alleges, adopts and incorporates by reference all averments in the foregoing paragraphs.

100.    Under the federal FMLA, an "eligible employee" is entitled to take up to twelve weeks of unpaid leave in any twelve-month period for qualifying medical or family reasons. 29 U.S.C. § 2612(a)(1) (2013).

101.    An "eligible employee" is one "who has been employed for at least 12 months by the employer with respect to whom leave is requested…for at least 1,250 hours of service with such employer during the previous 12-month period, [and] is employed at a worksite where 50 or more employees are employed by the employer within 75 miles of that worksite." 29 U.S.C. § 2611(2)(A); 29 C.F.R. § 825.110(a) (brackets added).

102.    At all times pertinent and relevant to this complaint, Ms. McCloskey was an FMLA-eligible employee, as she had been employed by the District of Columbia since February 11, 2013 and had been employed for a period exceeding twelve (12) months.  Ms. McCloskey held a full-

time position for her entire employ with the District of Columbia and worked at least 1,250 hours during the twelve (12) months preceding the date of FMLA.

103.    A city or town is considered a single public agency and, therefore, a single employer for purposes of determining employee eligibility under the federal FMLA. 29 C.F.R. § 825.108(c)(1).

104.    The District of Columbia is subject to the requirements of the federal FMLA as a public, government agency.

105.    Ms. McCloskey is thus an "eligible employee" for FMLA purposes.

106.    An eligible employee may take up to 12 weeks of leave during any 12-month period in order to care for a spouse who has a serious health condition. 29 U.S.C. § 2612 (a)(1)(c).

107.    A "serious health condition" is defined as an "illness, injury, impairment, or physical or mental condition that involves inpatient care…or continuing treatment by a health care provider." 29 U.S.C. § 2611(11).

108.    "Continuing treatment" includes "a period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition that also involves treatment two or more times, within 30 days of the first day of incapacity…by a health care provider…or treatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider." "[T]reatment by a health care provider means an in-person visit to a health care provider. The first (or only) in-person treatment visit must take place within seven days of the first day of incapacity." 29 C.F.R. § 825.115(a)(1)-(3).

109.    In 2019, Ms. McCloskey's husband became seriously ill. He was hospitalized several times, over many months, for a serious medical condition. His health continued to deteriorate, and he eventually died from his ailment. Thus, Ms. McCloskey's husband had a "serious health

condition," as he was hospitalized several times and had a regimen of continuing treatment by a health care provider until his passing.

110.    "[E]mployers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under no fault attendance policies." 29 C.F.R. § 825.220(c).

111.    "On return from FMLA leave, an employee is entitled to be returned to the same position the employee held when leave commenced, or to an equivalent position with equivalent benefits…." 29 C.F.R. § 825.214.

112.    Under the federal FMLA, "[a]ny violations of the Act or of these regulations constitute interfering with, restraining, or denying the exercise of rights provided by the Act." 29 C.F.R. § 825.220(b).

113.    On June 24, 2019, Ms. McCloskey requested Family Leave beginning June 27, 2019 to care for her husband. DOC granted her request and Ms. McCloskey received FMLA leave through August 22, 2019.

114.    On August 14, 2019, Ms. McCloskey made another request for Family Leave beginning August 22, 2019 to care for her husband. DOC granted her request and Ms. McCloskey received FMLA leave through September 16, 2019.

115.    Upon her return to work after taking FMLA leave, Defendant failed to return Ms. McCloskey to the same position she held when her leave commenced and she no longer had an equivalent position with the same job duties and responsibilities.

116.    Before taking FMLA leave, Ms. McCloskey was primarily responsible for DOC's JACCS, CENTRICITY, and CENSUS databases. Ms. McCloskey was given two projects, the KACE Help

Desk project and documenting backup of the JACCS database to a test server, neither of which were equivalent to her previous duties.

117.    The change in Ms. McCloskey's job duties and responsibilities from production/relational database management systems to the projects she was assigned, as well as the change in reporting structure to a co-worker, was a material and significant change in the terms and conditions of Ms. McCloskey's employment with DOC which interfered with her FMLA rights.

118.    Mr. Hsu admitted that Ms. McCloskey's "role has changed" and that DOC hired another IT employee to serve as a full-time database administrator responsible for JACCS, CENTRICITY, and CENSUS databases. Thus, Defendant, through its agent Mr. Hsu, did not allow Ms. McCloskey to return to her previous position and she did not have the same job duties and responsibilities as before the exercise of her right to take FMLA leave to care for her husband. This loss in employment status is remediable through appropriate equitable relief, such as restoring Ms. McCloskey back to the same position she held prior to taking FMLA leave, and/or other liquidated damages/compensation for her loss.

119.    Defendant, through its agent Mr. Hsu, also interfered with Ms. McCloskey's FMLA rights by imposing a "no fault attendance policy" or a restricted work schedule. The policy imposed upon Ms. McCloskey, which was not extended to the entire department, included no late arrival, no ability to makeup time and no flexible hours. Mr. Hsu singled out Ms. McCloskey with a "no fault" strict work schedule whereas her co-workers were able to have flexible work start and end times, thereby interfering with her FMLA rights.

120.    Defendant, through its agent Mr. Hsu, interfered with Ms. McCloskey's FMLA rights by failing to assist her in obtaining the appropriate leave she needed to care for her husband. When Ms. McCloskey needed intermittent leave in October, November and December 2019, Mr. Hsu

instead made unreasonable demands regarding the procedure and process to obtain leave, including imposing the requirement that Ms. McCloskey provide a leave slip in-person and at the office.

121.    If Mr. Hsu did not have sufficient information about the reason for Ms. McCloskey's leave, Defendant should have made further inquiry to ascertain whether the leave was FMLA-qualifying. 29 C.F.R. § 825.301(a). Mr. Hsu failed to do this.

122.    If Mr. Hsu continued to dispute whether Ms. McCloskey's leave qualified as FMLA leave, Defendant should have resolved the dispute through discussions.  29 C.F.R. § 825.301(c). Mr. Hsu failed to have these discussions with Ms. McCloskey and therefore interfered with her FMLA rights.

123.    Ms. McCloskey, on her own initiative, and without assistance or guidance from Mr. Hsu, requested Family Leave beginning October 27, 2019 to care for her husband. Defendant granted her request for intermittent leave on December 23, 2019.

124.    Defendant's actions as alleged herein had a material and negative impact on the terms and conditions of Ms. McCloskey's employment. As a direct and proximate result of the unlawful acts of Defendant, and its agent, Mr. Hsu, Ms. McCloskey has suffered grievous harm to her professional career.  This harm includes, but is not limited to, loss of professional status and reputation, loss of career-enhancing opportunities and advancement, loss from unpaid leave status, loss of other leave and/or other financial losses arising from the claims herein.

125.    As a direct and proximate result of the unlawful acts of Defendant, and its agent, Mr. Hsu, Defendant is additionally liable to Ms. McCloskey for those damages, as well as an additional amount as liquidated damages, attorneys' fees, the costs of this litigation, and accrued interest.

**Count II:  Violation of the DC Family and Medical Leave Act ("FMLA")**
**Interference With the Exercise of Rights**

126.    Ms. McCloskey re-alleges, adopts and incorporates by reference all averments in the foregoing paragraphs.

127.    Under the DC FMLA, an eligible employee is entitled to take up to sixteen weeks of leave in any 24-month period for qualifying medical or family reasons. DC Code § 32-502.

128.    An eligible employee is one who has been employed by the same employer for one year without a break in service except for regular holiday, sick or personal leave granted by the employer and has worked at least 1,000 hours during the 12-month period immediately preceding the request for leave.  DC Code § 32-501(1).

129.    At all times pertinent and relevant to this complaint, Ms. McCloskey was an FMLA-eligible employee, as she had been employed by the District of Columbia since February 11, 2013 and had been employed for a period exceeding twelve (12) months.  Ms. McCloskey held a full-time position for her entire employ with the District of Columbia and worked at least 1,000 hours during the twelve (12) months preceding the date of FMLA.

130.    The District of Columbia government is considered an employer and subject to the requirements of the DC FMLA. DC Code § 32-501(2).

131.    Ms. McCloskey is thus an "eligible employee" for FMLA purposes.

132.    An eligible employee may take up to 16 weeks of leave during any 24-month period in order to care for a spouse who has a serious health condition. DC Code § 32-501(4); DC Code § 32-502(a)(4).

133.    A serious health condition is defined as a physical or mental illness, injury or impairment that involves inpatient care in a hospital, hospice or residential health care facility or continuing

treatment or supervision at home by a health care provider or other competent individual. DC Code § 32-502(9).

134.    In 2019, Ms. McCloskey's husband became seriously ill. He was hospitalized several times, over many months, for a serious medical condition. His health continued to deteriorate, and he eventually died from his ailment. Thus, Ms. McCloskey's husband had a "serious health condition," as he was hospitalized several times and had a regimen of continuing treatment by a health care provider until his passing.

135.    An employee that takes FMLA leave shall not lose any employment benefit or seniority accrued before the date the family or medical leave commenced. DC Code § 32-505(a).

136.    On return from FMLA leave, an employee shall be restored to the position of employment held by the employee when the leave commenced or restored to a position of employment equivalent to the position held by the employee when the family or medical leave commenced that includes equivalent employment benefits, pay, seniority, and other terms and conditions of employment. DC Code § 32-505(d).

137.    It shall be unlawful for any person to interfere with, restrain, or deny the exercise of or the attempt to exercise any right under the DC FMLA. DC Code § 32-507.

138.    On June 24, 2019, Ms. McCloskey requested Family Leave beginning June 27, 2019 to care for her husband. DOC granted her request and Ms. McCloskey received FMLA leave through August 22, 2019.

139.    On August 14, 2019, Ms. McCloskey made another request for Family Leave beginning August 22, 2019 to care for her husband. DOC granted her request and Ms. McCloskey received FMLA leave through September 16, 2019.

140.    Upon her return to work after taking FMLA leave, Defendant failed to return Ms. McCloskey to the same position she held when her leave commenced and she no longer had an equivalent position with the same job duties and responsibilities.

141.    Before taking FMLA leave, Ms. McCloskey was primarily responsible for DOC's JACCS, CENTRICITY, and CENSUS databases. Ms. McCloskey was given two projects, the KACE Help Desk project and documenting backup of the JACCS database to a test server, neither of which were equivalent to her previous duties.

142.    The change in Ms. McCloskey's job duties and responsibilities from production/relational database management systems to the projects she was assigned, as well as the change in reporting structure to a co-worker, was a material and significant change in the terms and conditions of Ms. McCloskey's employment with DOC which interfered with her FMLA rights.

143.    Mr. Hsu admitted that Ms. McCloskey's "role has changed" and that DOC hired another IT employee to serve as a full-time database administrator responsible for JACCS, CENTRICITY, and CENSUS databases. Thus, Defendant, through its agent Mr. Hsu, did not allow Ms. McCloskey to return to her previous position and she did not have the same job duties and responsibilities as before the exercise of her right to take FMLA leave to care for her husband. This loss in employment status is remediable through appropriate equitable relief, such as restoring Ms. McCloskey back to the same position she held prior to taking FMLA leave, and/or other liquidated damages/compensation for her loss.

144.    Defendant, through its agent Mr. Hsu, also interfered with Ms. McCloskey's FMLA rights by imposing a "no fault attendance policy" or a restricted work schedule. The policy imposed upon Ms. McCloskey, which was not extended to the entire department, included no late arrival, no ability to makeup time and no flexible hours. Mr. Hsu singled out Ms. McCloskey with a "no fault"

strict work schedule whereas her co-workers were able to have flexible work start and end times, thereby interfering with her FMLA rights.

145.   Defendant, through its agent Mr. Hsu, interfered with Ms. McCloskey's FMLA rights by failing to assist her in obtaining the appropriate leave she needed to care for her husband. When Ms. McCloskey needed intermittent leave in October, November and December 2019, Mr. Hsu instead made unreasonable demands regarding the procedure and process to obtain leave, including imposing the requirement that Ms. McCloskey provide a leave slip in-person and at the office.

146.   If Mr. Hsu did not have sufficient information about the reason for Ms. McCloskey's leave, Defendant should have made further inquiry to ascertain whether the leave was FMLA-qualifying. Mr. Hsu failed to do this.

147.   If Mr. Hsu continued to dispute whether Ms. McCloskey's leave qualified as FMLA leave, Defendant should have resolved the dispute through discussions. Mr. Hsu failed to have these discussions with Ms. McCloskey and therefore interfered with her FMLA rights.

148.   Ms. McCloskey, on her own initiative, and without assistance or guidance from Mr. Hsu, requested Family Leave beginning October 27, 2019 to care for her husband. Defendant granted her request for intermittent leave on December 23, 2019.

149.   Defendant's actions as alleged herein had a material and negative impact on the terms and conditions of Ms. McCloskey's employment. As a direct and proximate result of the unlawful acts of Defendant, and its agent, Mr. Hsu, Ms. McCloskey has suffered grievous harm to her professional career.  This harm includes, but is not limited to, loss of professional status and reputation, loss of career-enhancing opportunities and advancement, loss from unpaid leave status, loss of other leave and/or other financial losses arising from the claims herein.

150.    As a direct and proximate result of the unlawful acts of Defendant, and its agent, Mr. Hsu, Defendant is additionally liable to Ms. McCloskey for those damages, as well as an additional amount as liquidated damages, attorneys' fees, the costs of this litigation, and accrued interest.

### Count III:  Violation of the Federal Family and Medical Leave Act ("FMLA") Retaliation for the Exercise of Rights

151.    Ms. McCloskey re-alleges, adopts and incorporates by reference all averments in the foregoing paragraphs.

152.    Ms. McCloskey was an eligible employee entitled to take FMLA leave for the care of her husband who had a serious health condition as averred in the foregoing paragraphs.

153.    The federal FMLA prohibits employers from "discriminat[ing] against any individual for opposing any practice made unlawful by this title." 29 U.S.C. § 2615(a)(2) (2013). The FMLA provides prescriptive rights that protect employees from discrimination or retaliation for exercising their substantive rights under the Act.

154.    On June 24, 2019, Ms. McCloskey requested Family Leave beginning June 27, 2019 to care for her husband. DOC granted her request and Ms. McCloskey received FMLA leave through August 22, 2019.

155.    On August 14, 2019, Ms. McCloskey made another request for Family Leave beginning August 22, 2019 to care for her husband. DOC granted her request and Ms. McCloskey received FMLA leave through September 16, 2019.

156.    By requesting this leave, Ms. McCloskey engaged in protected activity under the federal FMLA.

157.    Upon her return to work after taking FMLA leave, Defendant failed to return Ms. McCloskey to the same position she held when her leave commenced and she no longer had an equivalent position with the same job duties and responsibilities.

158.    Before taking FMLA leave, Ms. McCloskey was primarily responsible for DOC's JACCS, CENTRICITY, and CENSUS databases. Ms. McCloskey was given two projects, the KACE Help Desk project and documenting backup of the JACCS database to a test server, neither of which were equivalent to her previous duties.

159.    The change in Ms. McCloskey's job duties and responsibilities from production/relational database management systems to the projects she was assigned, as well as the change in reporting structure to a co-worker, was a material and significant change in the terms and conditions of Ms. McCloskey's employment with DOC which was in retaliation for exercising her FMLA rights.

160.    Mr. Hsu admitted that Ms. McCloskey's "role has changed" and that DOC hired another IT employee to serve as a full-time database administrator responsible for JACCS, CENTRICITY, and CENSUS databases. Thus, Defendant, through its agent Mr. Hsu, did not allow Ms. McCloskey to return to her previous position and she did not have the same job duties and responsibilities as before the exercise of her right to take FMLA leave to care for her husband. This loss in employment status is remediable through appropriate equitable relief, such as restoring Ms. McCloskey back to the same position she held prior to taking FMLA leave, and/or other liquidated damages/compensation for her loss.

161.    Defendant, through its agent Mr. Hsu, also retaliated against Ms. McCloskey's exercise of FMLA rights by imposing a "no fault attendance policy" or a restricted work schedule. The policy imposed upon Ms. McCloskey, which was not extended to the entire department, included no late arrival, no ability to makeup time and no flexible hours. Mr. Hsu singled out Ms. McCloskey with a "no fault" strict work schedule whereas her co-workers were able to have flexible work start and end times, thereby retaliating against her for the exercise of her FMLA rights.

162.    Defendant, through its agent Mr. Hsu, retaliated against Ms. McCloskey's FMLA rights by failing to assist her in obtaining the appropriate leave she needed to care for her husband. When Ms. McCloskey needed intermittent leave in October, November and December 2019, Mr. Hsu instead made unreasonable demands regarding the procedure and process to obtain leave, including imposing the requirement that Ms. McCloskey provide a leave slip in-person and at the office.

163.    If Mr. Hsu did not have sufficient information about the reason for Ms. McCloskey's leave, Defendant should have made further inquiry to ascertain whether the leave was FMLA-qualifying. 29 C.F.R. § 825.301(a). Mr. Hsu failed to do this.

164.    If Mr. Hsu continued to dispute whether Ms. McCloskey's leave qualified as FMLA leave, Defendant should have resolved the dispute through discussions. 29 C.F.R. § 825.301(c). Mr. Hsu failed to have these discussions with Ms. McCloskey and therefore retaliated against her for her exercise of FMLA rights.

165.    Ms. McCloskey, on her own initiative, and without assistance or guidance from Mr. Hsu, requested Family Leave beginning October 27, 2019 to care for her husband. Defendant granted her request for intermittent leave on December 23, 2019.

166.    Defendant's actions as alleged herein had a material and negative impact on the terms and conditions of Ms. McCloskey's employment. As a direct and proximate result of the unlawful acts of Defendant, and its agent, Mr. Hsu, Ms. McCloskey has suffered grievous harm to her professional career.  This harm includes, but is not limited to, loss of professional status and reputation, loss of career-enhancing opportunities and advancement, loss from unpaid leave status, loss of other leave and/or other financial losses arising from the claims herein.

167.    As a direct and proximate result of the unlawful acts of Defendant, and its agent, Mr. Hsu, Defendant is additionally liable to Ms. McCloskey for those damages, as well as an additional amount as liquidated damages, attorneys' fees, the costs of this litigation, and accrued interest.

**Count IV:  Violation of the DC Family and Medical Leave Act ("FMLA")**
**Retaliation for the Exercise of Rights**

168.    Ms. McCloskey re-alleges, adopts and incorporates by reference all averments in the foregoing paragraphs.

169.    Ms. McCloskey was an eligible employee entitled to take FMLA leave for the care of her husband who had a serious health condition as averred in the foregoing paragraphs.

170.    The DC FMLA provides that it shall be unlawful for an employer to discharge or discriminate in any manner against any person because the person opposes any practice made unlawful by this chapter. DC Code § 32-507(b).

171.    On June 24, 2019, Ms. McCloskey requested Family Leave beginning June 27, 2019 to care for her husband. DOC granted her request and Ms. McCloskey received FMLA leave through August 22, 2019.

172.    On August 14, 2019, Ms. McCloskey made another request for Family Leave beginning August 22, 2019 to care for her husband. DOC granted her request and Ms. McCloskey received FMLA leave through September 16, 2019.

173.    By requesting this leave, Ms. McCloskey engaged in protected activity under the DC FMLA.

174.    Upon her return to work after taking FMLA leave, Defendant failed to return Ms. McCloskey to the same position she held when her leave commenced and she no longer had an equivalent position with the same job duties and responsibilities.

- 32 -

175.    Before taking FMLA leave, Ms. McCloskey was primarily responsible for DOC's JACCS, CENTRICITY, and CENSUS databases. Ms. McCloskey was given two projects, the KACE Help Desk project and documenting backup of the JACCS database to a test server, neither of which were equivalent to her previous duties.

176.    The change in Ms. McCloskey's job duties and responsibilities from production/relational database management systems to the projects she was assigned, as well as the change in reporting structure to a co-worker, was a material and significant change in the terms and conditions of Ms. McCloskey's employment with DOC which was in retaliation for exercising her FMLA rights.

177.    Mr. Hsu admitted that Ms. McCloskey's "role has changed" and that DOC hired another IT employee to serve as a full-time database administrator responsible for JACCS, CENTRICITY, and CENSUS databases. Thus, Defendant, through its agent Mr. Hsu, did not allow Ms. McCloskey to return to her previous position and she did not have the same job duties and responsibilities as before the exercise of her right to take FMLA leave to care for her husband. This loss in employment status is remediable through appropriate equitable relief, such as restoring Ms. McCloskey back to the same position she held prior to taking FMLA leave, and/or other liquidated damages/compensation for her loss.

178.    Defendant, through its agent Mr. Hsu, also retaliated against Ms. McCloskey's exercise of FMLA rights by imposing a "no fault attendance policy" or a restricted work schedule. The policy imposed upon Ms. McCloskey, which was not extended to the entire department, included no late arrival, no ability to makeup time and no flexible hours. Mr. Hsu singled out Ms. McCloskey with a "no fault" strict work schedule whereas her co-workers were able to have flexible work start and end times, thereby retaliating against her for the exercise of her FMLA rights.

179.    Defendant, through its agent Mr. Hsu, retaliated against Ms. McCloskey's FMLA rights by failing to assist her in obtaining the appropriate leave she needed to care for her husband. When Ms. McCloskey needed intermittent leave in October, November and December 2019, Mr. Hsu instead made unreasonable demands regarding the procedure and process to obtain leave, including imposing the requirement that Ms. McCloskey provide a leave slip in-person and at the office.

180.    If Mr. Hsu did not have sufficient information about the reason for Ms. McCloskey's leave, Defendant should have made further inquiry to ascertain whether the leave was FMLA-qualifying. Mr. Hsu failed to do this.

181.    If Mr. Hsu continued to dispute whether Ms. McCloskey's leave qualified as FMLA leave, Defendant should have resolved the dispute through discussions. Mr. Hsu failed to have these discussions with Ms. McCloskey and therefore retaliated against her for her exercise of FMLA rights.

182.    Ms. McCloskey, on her own initiative, and without assistance or guidance from Mr. Hsu, requested Family Leave beginning October 27, 2019 to care for her husband. Defendant granted her request for intermittent leave on December 23, 2019.

183.    Defendant's actions as alleged herein had a material and negative impact on the terms and conditions of Ms. McCloskey's employment. As a direct and proximate result of the unlawful acts of Defendant, and its agent, Mr. Hsu, Ms. McCloskey has suffered grievous harm to her professional career.  This harm includes, but is not limited to, loss of professional status and reputation, loss of career-enhancing opportunities and advancement, loss from unpaid leave status, loss of other leave and/or other financial losses arising from the claims herein.

184.     As a direct and proximate result of the unlawful acts of Defendant, and its agent, Mr. Hsu, Defendant is additionally liable to Ms. McCloskey for those damages, as well as an additional amount as liquidated damages, attorneys' fees, the costs of this litigation, and accrued interest.

### Count V:  Violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* Retaliation Against Ms. McCloskey for Engaging in Protected Activity

185.     Ms. McCloskey re-alleges, adopts and incorporates by reference all averments in the foregoing paragraphs.

186.     Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3, provides that it shall be an unlawful employment practice for an employer to discriminate against any of its employees because that employee has opposed any practice made unlawful by Title VII or because the employee has made a charge or participated in any manner in an investigation, proceeding or hearing.

187.     Ms. McCloskey worked for the District of Columbia government and was employed by DOC which is an executive branch agency of the District of Columbia government.

188.     Ms. McCloskey engaged in protected activity under Title VII.

189.     On or about August 18, 2016, Ms. McCloskey filed a discrimination complaint with the District of Columbia Office of Human Rights ("DCOHR") by completing an Intake Questionnaire.

190.     On or about October 31, 2016, Ms. McCloskey filed a second internal EEO complaint.

191.     On or about February 24, 2017, DCOHR accepted Ms. McCloskey's complaint and issued a Charge of Discrimination asserting that DOC and its agent Mr. Hsu discriminated against Ms. McCloskey on the basis of sex, national origin and retaliation.

192.     On or about April 12, 2017, Ms. McCloskey filed an Amended Charge of Discrimination with DCOHR.

193.    On or about May 22, 2017, Ms. McCloskey filed a second Amended Charge of Discrimination with DCOHR.

194.    Defendant and its agents, including Mr. Hsu, were aware of Ms. McCloskey's protected activity under Title VII. On or about July 18, 2018, Mr. Hsu gave a sworn statement in connection with the investigation of Ms. McCloskey's Charge of Discrimination with DCOHR.

195.    After engaging in protected activity, Ms. McCloskey was placed on administrative leave from April 25, 2017 to June 16, 2019, when her employment with DOC was reinstated.

196.    On September 24, 2019, Mr. Hsu retaliated against Ms. McCloskey by issuing a written counseling letter admonishing her for bringing her laptop to work without official approval. Upon information and belief, there was no written policy prohibiting the use of personal electronic devises and other co-workers, including Mr. Hsu, brought electronic devices to work without any consequence or disciplinary action. Ms. McCloskey had her own computer because Mr. Hsu failed to provide her with the tools, materials and equipment necessary to do her job.

197.    Upon her return to work, Defendant failed to return Ms. McCloskey to the same position she held prior to engaging in protected activity under Title VII and she no longer had an equivalent position with the same job duties and responsibilities.

198.    Before engaging in protected activity under Title VII, Ms. McCloskey was primarily responsible for DOC's JACCS, CENTRICITY, and CENSUS databases. Ms. McCloskey was given two projects, the KACE Help Desk project and documenting backup of the JACCS database to a test server, neither of which were equivalent to her previous duties.

199.    The change in Ms. McCloskey's job duties and responsibilities from production/relational database management systems to the projects she was assigned, as well as the change in reporting

structure to a co-worker, was a material and significant change in the terms and conditions of Ms. McCloskey's employment with DOC which was in retaliation for exercising her Title VII rights.

200.    Mr. Hsu admitted that Ms. McCloskey's "role has changed" and that DOC hired another IT employee to serve as a full-time database administrator responsible for JACCS, CENTRICITY, and CENSUS databases. Thus, Defendant, through its agent Mr. Hsu, did not allow Ms. McCloskey to return to her previous position and she did not have the same job duties and responsibilities as before she engaged in protected activity under Title VII.

201.    Defendant, through its agent Mr. Hsu, also retaliated against Ms. McCloskey by imposing a "no fault attendance policy" or a restricted work schedule. The policy imposed upon Ms. McCloskey, which was not extended to the entire department, included no late arrival, no ability to makeup time and no flexible hours. Mr. Hsu singled out Ms. McCloskey with a "no fault" strict work schedule whereas her co-workers were able to have flexible work start and end times, thereby retaliating against her for engaging in protected activity under Title VII.

202.    Ms. McCloskey additionally alleges that Defendant, through its agent Mr. Hsu, subjected her to adverse and disparate treatment in retaliation for her participation in protected activity. Defendant, through its agent Mr. Hsu treated Ms. McCloskey differently and less favorably because of her protected activities. Ms. McCloskey further alleges that these acts and practices violate Title VII.

203.    Ms. McCloskey suffered significant and undo stress as a result of the actions of Defendant and its agent, Mr. Hsu. Ms. McCloskey was in a constant state of fear, worry and anxiety about next negative and unfavorable action that Mr. Hsu would take against her. Ms. McCloskey was also fearful of being unfairly disciplined and/or being set-up for an action by Mr. Hsu that could result in the loss of her employment. Ms. McCloskey did not feel emotionally or physically safe

working under Mr. Hsu's supervision and she perceived the work environment to be hostile. The stressful workplace caused Ms. McCloskey to break out in hives and suffer other health-related emotional distress.

204.     Defendant's actions as alleged herein had a material and negative impact on the terms and conditions of Ms. McCloskey's employment. As a direct and proximate result of the unlawful acts of Defendant, and its agent, Mr. Hsu, Ms. McCloskey has suffered grievous harm to her professional career.  This harm includes, but is not limited to, loss of professional status and reputation, loss of career-enhancing opportunities and advancement, loss from unpaid leave status, loss of other leave and/or other financial losses arising from the claims herein.

205.     As a direct and proximate result of the unlawful acts of Defendant, and its agent, Mr. Hsu, Defendant is additionally liable to Ms. McCloskey for those damages, as well as for attorneys' fees, the costs of this litigation, and accrued interest.

### Count VI:  Violation of DC Human Rights Act of 1977, D.C. Code § 2-1401 *et seq*. Retaliation Against Ms. McCloskey for Engaging in Protected Activity

206.     Ms. McCloskey re-alleges, adopts and incorporates by reference all averments in the foregoing paragraphs.

207.     The DCHRA, DC Code § 2-1402.61 provides that it shall be an unlawful discriminatory practice to retaliate against, interfere with, intimidate or discriminate against a person, because that person has opposed any practice made unlawful by this chapter, or because that person has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing authorized under this chapter.

208.     Ms. McCloskey worked for the District of Columbia government and was employed by DOC which is an executive branch agency of the District of Columbia government.

209.     Ms. McCloskey engaged in protected activity under the DCHRA.

210.   On or about August 18, 2016, Ms. McCloskey filed a discrimination complaint with the District of Columbia Office of Human Rights ("DCOHR") by completing an Intake Questionnaire.

211.   On or about October 31, 2016, Ms. McCloskey filed a second internal EEO complaint.

212.   On or about February 24, 2017, DCOHR accepted Ms. McCloskey's complaint and issued a Charge of Discrimination asserting that DOC and its agent Mr. Hsu discriminated against Ms. McCloskey on the basis of sex, national origin and retaliation.

213.   On or about April 12, 2017, Ms. McCloskey filed an Amended Charge of Discrimination with DCOHR.

214.   On or about May 22, 2017, Ms. McCloskey filed a second Amended Charge of Discrimination with DCOHR.

215.   Defendant and its agents, including Mr. Hsu, were aware of Ms. McCloskey's protected activity under the DCHRA. On or about July 18, 2018, Mr. Hsu gave a sworn statement in connection with the investigation of Ms. McCloskey's Charge of Discrimination with DCOHR.

216.   After engaging in protected activity, Ms. McCloskey was placed on administrative leave from April 25, 2017 to June 16, 2019, when her employment with DOC was reinstated.

217.   On September 24, 2019, Mr. Hsu retaliated against Ms. McCloskey by issuing a written counseling letter admonishing her for bringing her laptop to work without official approval. Upon information and belief, there was no written policy prohibiting the use of personal electronic devises and other co-workers, including Mr. Hsu, brought electronic devices to work without any consequence or disciplinary action. Ms. McCloskey had her own computer because Mr. Hsu failed to provide her with the tools, materials and equipment necessary to do her job.

218.    Upon her return to work, Defendant failed to return Ms. McCloskey to the same position she held prior to engaging in protected activity under the DCHRA and she no longer had an equivalent position with the same job duties and responsibilities.

219.    Before engaging in protected activity under the DCHRA, Ms. McCloskey was primarily responsible for DOC's JACCS, CENTRICITY, and CENSUS databases. Ms. McCloskey was given two projects, the KACE Help Desk project and documenting backup of the JACCS database to a test server, neither of which were equivalent to her previous duties.

220.    The change in Ms. McCloskey's job duties and responsibilities from production/relational database management systems to the projects she was assigned, as well as the change in reporting structure to a co-worker, was a material and significant change in the terms and conditions of Ms. McCloskey's employment with DOC which was in retaliation for exercising her rights under the DCHRA.

221.    Mr. Hsu admitted that Ms. McCloskey's "role has changed" and that DOC hired another IT employee to serve as a full-time database administrator responsible for JACCS, CENTRICITY, and CENSUS databases. Thus, Defendant, through its agent Mr. Hsu, did not allow Ms. McCloskey to return to her previous position and she did not have the same job duties and responsibilities as before she engaged in protected activity under the DCHRA.

222.    Defendant, through its agent Mr. Hsu, also retaliated against Ms. McCloskey by imposing a "no fault attendance policy" or a restricted work schedule. The policy imposed upon Ms. McCloskey, which was not extended to the entire department, included no late arrival, no ability to makeup time and no flexible hours. Mr. Hsu singled out Ms. McCloskey with a "no fault" strict work schedule whereas her co-workers were able to have flexible work start and end times, thereby retaliating against her for engaging in protected activity under the DCHRA.

223.    Ms. McCloskey additionally alleges that Defendant, through its agent Mr. Hsu, subjected her to adverse and disparate treatment in retaliation for her participation in protected activity. Defendant, through its agent Mr. Hsu treated Ms. McCloskey differently and less favorably because of her protected activities. Ms. McCloskey further alleges that these acts and practices violate the DCHRA.

224.    Ms. McCloskey suffered significant and undo stress as a result of the actions of Defendant and its agent, Mr. Hsu. Ms. McCloskey was in a constant state of fear, worry and anxiety about next negative and unfavorable action that Mr. Hsu would take against her. Ms. McCloskey was also fearful of being unfairly disciplined and/or being set-up for an action by Mr. Hsu that could result in the loss of her employment. Ms. McCloskey did not feel emotionally or physically safe working under Mr. Hsu's supervision and she perceived the work environment to be hostile. The stressful workplace caused Ms. McCloskey to break out in hives and suffer other health-related emotional distress.

225.    Defendant's actions as alleged herein had a material and negative impact on the terms and conditions of Ms. McCloskey's employment. As a direct and proximate result of the unlawful acts of Defendant, and its agent, Mr. Hsu, Ms. McCloskey has suffered grievous harm to her professional career.  This harm includes, but is not limited to, loss of professional status and reputation, loss of career-enhancing opportunities and advancement, loss from unpaid leave status, loss of other leave and/or other financial losses arising from the claims herein.

226.    As a direct and proximate result of the unlawful acts of Defendant, and its agent, Mr. Hsu, Defendant is additionally liable to Ms. McCloskey for those damages, as well as for attorneys' fees, the costs of this litigation, and accrued interest.

## RELIEF SOUGHT

**WHEREFORE**, Ms. McCloskey respectfully requests this Court to award damages in an amount to be proved at trial, and that the Court further:

A.      Enter judgment for Ms. McCloskey against Defendant on all Counts;

B.      Declare that the conduct of Defendant is in violation of the federal FMLA by its interference with Ms. McCloskey's FMLA rights;

C.      Declare that the conduct of Defendant is in violation of the DCFMLA by its interference with Ms. McCloskey's FMLA rights;

D.      Declare that Defendant retaliated against Ms. McCloskey in violation of the federal FMLA;

E.      Declare that Defendant retaliated against Ms. McCloskey in violation of the DCFMLA;

F.      Declare that Defendant subjected Ms. McCloskey to retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended;

G.      Declare that Defendant subjected Ms. McCloskey to retaliation in violation of the DCHRA, as amended;

H.      Award Ms. McCloskey benefits, entitlements, loss of professional status and career-enhancing and advancement opportunities, annual leave, loss of other leave, and other remuneration and privileges of employment retroactive to the date of any unlawful action found to have occurred in this case;

I.      Award an additional amount as liquidated damages;

J.      Award Ms. McCloskey compensatory damages under Title VII and DCHRA for the injuries and losses that she suffered in an amount to be proved at trial;

K.      Award Ms. McCloskey pecuniary and out of pocket expenses;

L.      Enjoin Defendant from future retaliation and interference against Ms. McCloskey;

M.      Order Defendant to pay all reasonable attorneys' fees, court costs, and expenses Ms. McCloskey has and will incur as a result of Defendant's actions and inactions, as well as pre-judgment and post-judgment interest; and,

N.      Order such other equitable, liquidated damages and legal relief as necessary and appropriate to make Ms. McCloskey whole.

## JURY DEMAND

Ms. McCloskey requests a trial by a jury as to all claims set forth in her Complaint.

Respectfully submitted,

 /s/ CAMILLA C. MCKINNEY
Camilla C. McKinney, Esq.
D.C. Bar No. 448776
McKinney & Associates, PLLC
1629 K Street, NW, Suite 300
Washington, DC  20006
(202) 470-0935 (telephone)
(877) 590-4777 (facsimile)
CMcKinney@DCEmploymentLawyer.com
*Attorneys for Plaintiff Karen McCloskey*